**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| THE PNC FINANCIAL SERVICES | ) | |
| GROUP, INC.; PNC BANK, N.A. | ) | |
| Individually and as Successor in Interest to | ) | |
| National City Bank, | ) | Civil Action No. 13-331 |
| | ) | |
| Plaintiff, | ) | Judge Cathy Bissoon/ |
| | ) | Magistrate Judge Maureen P. Kelly |
| vs. | ) | |
| | ) | |
| | ) | |
| | ) | Re: ECF Nos. 47, 50 |
| HOUSTON CASUALTY COMPANY; | ) | |
| AXIS INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

## I.  RECOMMENDATION

Pending before the Court are cross motions for judgment on the pleadings filed by The

PNC Financial Services Group, Inc. and PNC Bank, N.A., individually and as successor in

interest to National City Bank ("Plaintiffs" or, collectively, "PNC")[ECF No. 47], and by

Houston Casualty Company ("HCC") and Axis Insurance Company ("Axis") (collectively

"Defendants" or "Insurers")[ECF No. 50], to determine whether policies issued by the Insurers

provide coverage for the settlement of three class action lawsuits filed against PNC and National

City Bank.

After careful review and consideration of the parties' motions, memoranda in support and

opposition thereto, as well as the extensive exhibits submitted to the Court for consideration, it is

respectfully recommended that the Motion for Judgment on the Pleadings filed by PNC be

granted and the Motion for Judgment on the Pleadings filed by the Insurers be denied.

1

## II.    REPORT

### A.    PROCEDURAL BACKGROUND

PNC filed this declaratory judgment and breach of contract action to determine its rights to defense costs and/or indemnification under certain insurance policies issued by Defendants for the settlement of a series of class action lawsuits filed against PNC as well as National City Bank ("National City").[1] Defendants filed an Answer, asserting the absence of coverage under the terms of the policies at issue and contending that coverage is otherwise unavailable pursuant to applicable Pennsylvania public policy.  Each party has filed a Motion for Judgment on the Pleadings, asserting that in the absence of any material issues of fact, the moving party is entitled to judgment as a matter of law.

### B.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(c), a court will grant a motion for judgment on the pleadings if the movant establishes that "there are no issues of material fact, and that he is entitled to judgment as a matter of law." Allstate Prop. & Cas. Ins. Co. v. Squires, 667 F.3d 388, 390 (3d Cir. 2012)(quoting Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 220 (3d Cir. 2005)). In considering a motion for judgment on the pleadings, a court must accept all of the allegations in the pleadings of the party against whom the motion is addressed as true and draw all reasonable inferences in favor of the non-moving party. See Allah v. Al–Hafeez, 226 F.3d 247, 249 (3d Cir. 2000).

The parties have prepared an extensive Joint Appendix, [ECF No. 49], containing the relevant insurance policies at issue, as well as the complaints, certain other related documents and the settlement agreements filed in the underlying class action lawsuits.  In addition, the Court has examined certain motions and related opinions filed on the court dockets in the

---

[1] PNC acquired National City on or about October 28, 2008.

underlying lawsuits and other public records filed on behalf of PNC. In considering the parties'
cross motions for judgment on the pleadings, a court may consider "matters of public record,
orders, exhibits attached to the complaint and items appearing in the record of the case." <u>Oshiver
v. Levin, Fishbein, Sedran & Berman</u>, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994). A court may also
consider indisputably authentic documents that are referenced in or relied upon by the complaint.
<u>Spruill v. Gillis</u>, 372 F.3d 218, 223 (3d Cir. 2004) (holding that indisputable authentic documents
relating to a complaint could be considered on a motion for judgment on the pleadings).

### C.    FACTUAL BACKGROUND

The underlying class action litigation alleges claims relative to the manner in which PNC
and National City ordered customer debit card and ATM transactions so as to maximize fees
charged for overdraft protection. The Insurers declined coverage, contending that the underlying
litigation is uninsurable as a matter of public policy, and otherwise falls outside the express terms
of the insurance policies at issue.

### 1.    Underlying Litigation and Settlement Agreements

The parties are in agreement that PNC provided timely notice of the filing of the
following class action lawsuits:

    i.    <u>Casayuran v. PNC Bank, N.A.</u>, No. 2:09-CV-5155 (D.N.J..)
             ("<u>Casayuran</u>");

    ii.    <u>Trombley v. National City Bank</u>, No. 1:10-CV-232 (D.D.C.)
              ("<u>Trombley</u>");

    iii.    <u>Matos v. National City Bank</u>, No. 1:10-CV-21771 (S.D. Fla.)
              ("<u>Matos</u>");

    iv.    <u>Cowen v. PNC Bank</u>, No. 1:10-CV-21869 (S.D. Fla)("<u>Cowen</u>");

    v.    <u>Hernandez  v. PNC Bank</u>, No. 1:10-CV-21868 (S.D. Fla.)
              ("<u>Hernandez</u>"); and

vi. <u>Henry v. PNC Bank</u>, No. GD-10-022974 (Pa. C.P. Allegheny County) ("<u>Henry</u>").

[ECF No. 1, ¶ 25, ECF No. 49-5, p. 2, ECF No. 49-6, p. 2 ¶¶ 2, 48, 52, 53].  On December 6, 2010, the <u>Casayuran</u>, <u>Matos</u>, <u>Cowen</u>, and <u>Hernandez</u> cases were consolidated as part of an ongoing multi-district action, <u>In re: Checking Account Overdraft Litigation</u>, No. 09-MD-2036 (S.D. Fla.) ("MDL").  The MDL litigation involves claims against several banking institutions arising out of industry-wide debit card transaction posting policies and practices. With regard to PNC and National City, a Consolidated Amended Class Action Complaint was filed on December 6, 2010. [ECF No. 49-8, p. 2].

The MDL Complaint alleges claims against PNC and National City arising out of a common set of facts that have been alleged against each of the banks joined in the MDL. <u>See</u>, <u>e.g.</u>, <u>In re: Checking Account Overdraft Litigation</u>, No. 2036 (S.D. Fla.), ECF No. 80 (complaint as to Wachovia Bank, N.A.) and ECF No. 138 (complaint as to Union Bank).  The United States District Court for the Southern District of Florida summarized the relevant allegatios as follows.

> Over the past decade, Defendant Banks provided many of their checking account customers with debit cards, check cards or ATM cards. Through the use of debit cards, customers engage in transactions using funds from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or by withdrawing money from their accounts at automated teller machines ("ATMs"). Regardless of whether a debit card is used to execute POS transactions or to withdraw cash from ATM machines, the transaction is processed electronically, and the Banks are notified instantaneously when the card is physically passed ("swiped") through a receiving machine.

> When a customer swipes a debit card, the bank is able to determine immediately whether there are sufficient funds in the customer's account to cover the attempted POS or ATM transaction. The Banks have the option to accept or decline the transaction at that time. They have the technological capability to decline debit card transactions (which they do if a pending transaction would exceed a pre-determined, overdraft tolerance limit for an account), or to notify customers that the particular transaction will result in an overdraft. Rather than routinely declining debit card transactions or warning their customers that

4

completing the transaction would result in an overdraft fee, the Banks have adopted and implemented automatic, fee-based overdraft programs, processing debit card transactions and then charging their customers overdraft fees. The overdraft fee is typically $35 per overdraft. Defendant Banks do not give customers the option to decline to complete the debit transactions or provide other forms of payment. In addition, the Banks fail to adequately disclose to their customers that they can opt out of this overdraft policy, thereby avoiding all overdrafts and overdraft fees.

The Complaints further allege that Defendant Banks deploy advanced software to automate their overdraft systems to maximize the number of overdrafts and, thus, the amount of overdraft fees charged per customer. These automated overdraft programs manipulate and alter customers' transaction records to deplete the funds in a customer's account as rapidly as possible, resulting in more overdraft fees charged for multiple, smaller transactions. Overdrafts are likely to occur at times when, but for the Banks' manipulation and alteration, there would be sufficient funds in the account and many of these overdrafts would not occur at all.

Plaintiffs further state the most common way in which the Banks manipulate and alter customer accounts is by reordering debit transactions on a single day, or over multiple days, from largest to smallest amount, regardless of the actual chronological sequence in which the customer engaged in these transactions. Almost without exception, reordering debit transactions from highest to lowest results in more overdrafts than if the transactions were processed chronologically. For example, if a customer, whose account has a $50 balance at the time a bank processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, the bank would reorder the debits from largest to smallest, imposing four overdraft fees on the customer. Conversely, if the $100 transaction were debited last—consistent with the chronological order of the transactions, and with consumers' reasonable expectations—only one overdraft fee would be assessed. By holding charges rather than posting them immediately to an account, the Banks are able to amass a number of charges on the account. Subsequently, the Banks post all of the amassed charges on a single date, in order of largest to smallest, rather than in the order in which they were received or charged. This delayed posting results in multiple overdraft fees that would not otherwise be imposed.

The delayed posting also prevents customers from determining accurate account balances. In certain cases, customers are informed that they have a positive balance when, in reality, they have a negative balance, despite the Banks' actual knowledge of outstanding debits and transactions. Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account. For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available. Even when the Banks have knowledge of outstanding transactions that have

5

already created a negative balance in a customer's account, they approve, rather than decline, subsequent debit card purchases and other electronic transactions. Further, the Banks assess overdraft fees at times when the actual funds in customer accounts are sufficient to cover all debits that have been submitted for payment. The Banks do this by placing a "hold" on actual funds in customer accounts.

Specifically, Plaintiffs allege that they were personally injured by Defendant bank's practices. Defendant banks charged each of the Plaintiffs multiple overdraft fees. Plaintiffs contend they were forced to pay overdraft fees as a consequence of the Banks' wrongful overdraft policies and practices, depriving them of significant funds, and causing them ascertainable monetary losses and damages. Plaintiffs assert claims against the Banks for breach of contract and breach of the covenant of good faith and fair dealing, unconscionability, conversion, unjust enrichment, and for violations of various states' consumer protection statutes.

In re Checking Account Overdraft Litig., 694 F. Supp. 2d 1302, 1308-10 (S.D. Fla. 2010); and see, Consolidated Amended Class Action Complaint (PNC and National City), No. 09-MD-2036, ECF No. 991, ¶¶ 37-39, 49, 51, 56 – 60, 64-65, 90, 93.

Based upon the facts alleged, the consolidated MDL Complaint sets forth claims against PNC and National City for Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing (Count I); Unconscionability (Count II); Conversion (Count III); Unjust Enrichment (Count IV); and Violation of State Unfair Trade Practice Laws (Count IV).

In moving for class action certification in the MDL, the underlying plaintiffs described in detail PNC's conduct in determining transaction posting order to maximize profits gained from overdraft fees.

August 1996

PNC recognized that is was leaving substantial overdraft revenue on the table by posting debit transactions low-to-high…. On August 3, 1996, the Bank changed the posting order to high-to-low. High-to-low posting depletes the account balance as quickly as possible and thus maximizes the number of overdrafts. This change resulted in a substantial increase in the number of overdrafts (and thus overdraft revenue). Indeed, PNC's policy of posting its customers' debit

transaction was so successful in generating additional fees that it still exists to this day.

<u>August 1997</u>

*     *     *

In August 1997, in order to increase revenue, PNC retained Earnings Performance Group, Inc. ("EPG") to implement the Overdraft Parameter Matrix ("Matrix line of credit"), a tool designed by EPG to automate[] the decision process associated with paying and returning of debits presented against insufficient funds." … The Matrix line of credit, which PNC paid EPG $600,000 to deploy, secretly authorized debit transactions into overdraft up to a maximum or ceiling amount that the system determined was appropriate for each customer…

<u>March 1999</u>

On March 26, 1999, PNC again retained EPG, this time to reconfigure its Matrix line of credit program to account for the increased use of debit cards and point-of-sale ("POS") transactions and allow more overdrafts associated with such transactions to be paid,  The reconfigurations were estimated by EPG at the inception of the project to increase overdraft fee revenue between $5 and $8 million annually.  PNC paid EPG a flat fee of $400,000 for its work plus and additional 15% of all overdraft revenues generated by the changes to the program during the first year in excess of $3.2 million.

*     *     *

In or about August 2007, PNC retained Carreker, Inc. ("Carreker") to examine its overdraft policies and determine whether they could be amended to generate additional revenue.  Carreker recommended that PNC begin to keep a "real time" running calculation of an account's "available balance."  The available balance would be updated during the course of the day, decreasing it as PNC placed "memo post holds" based on transactions that are authorized but that have not yet posted to the account.  PNC would then post items against this available balance, rather than the ledger balance.  For example, if an account had a ledger balance of $100 to start the day, but the accountholder had $50 in transactions authorized during the day, as of September 18, 2008, the balance against which transactions were posted that night at 10:00 p.m. would be $50 despite the fact that the $50 had not yet settled and therefore $100 of actual funds remained in the customer's account.  Carreker estimated that this change alone would generate $16-18 million in additional annual overdraft revenue for PNC.

This recommended change was implemented on September 8, 2009.  And it worked.  Because the balance against which transactions were posted was very often smaller under the new system, this change, which Carreker and PNC

entitled "Posting Balance Standardization" ("PBS"), drastically increased the number of overdraft transactions (and concurrently, overdraft fee revenue), as predicted…. Carreker's contingency fee contract with PNC indicated that it would be paid a percentage of the new overdraft revenue generated by PBS. As a result of the fees generated by PBS, Carreker was paid in excess of $4 million.

[ECF No. 49-15, pp. 7 – 22].

PNC responded to the plaintiffs' claims by asserting that its customers could not claim surprise as to the fees assessed, given that responsible customers are or should be aware of account balances at any given time, and each Account Agreement disclosed PNC's ability to establish a posting transaction order. PNC argued that customers benefit from the high to low posting order because larger transactions, which may incur more serious consequences for a customer if not paid, are protected by being first in line for payment. PNC acknowledged that the decision to reorder transactions in 2000 served to increase revenues for the bank, an outcome which is not impermissible given the disclosures provided to each customer. [ECF No. 49-17, pp. 20]. The extent of profits earned through PNC's overdraft policies is summarized in certain of its 10-K Annual Reports filed with the Securities and Exchange Commission. For example, PNC acknowledged that in fiscal year 2012, service charges on deposits decreased from $705 million in 2010 to $534 million, primarily as a result of the promulgation of new federal consumer protection regulations addressing overdraft service practices. See, The PNC Financial Services Group, Inc., Annual Report (Form 10-K), at 109 (March 1, 2013)

In the Trombley action, plaintiffs allege similar overdraft practice claims against National City Bank, on behalf of named class members residing in Ohio and Michigan and putative class members nationwide, and include causes of action for the violation of Ohio and Michigan state consumer protection laws, the Electronic Funds Transfer Act and Regulation E (Counts 6 – 8).

The Henry Complaint was filed in the Court of Common Pleas of Allegheny County, Pennsylvania, on behalf of PNC customers nationwide, and alleges claims arising out of PNC's undisclosed or concealed debit card transaction posting practices, which served to maximize overdraft fees. PNC filed preliminary objections to the Henry Complaint, seeking the dismissal of each cause of action and contending that the practices were adequately disclosed in the written Account Agreement. "Plaintiff's account with PNC is governed by the terms of her Account Agreement. Her claims rise and fall with the terms of that contract. As such, she cannot maintain any claims in tort as a matter of law." Henry v. PNC Bank, GD-10-022974, No. 12, p. 4 (Pa. C.P. Allegheny County, March 16, 2011).

The Honorable R. Stanton Wettick, Jr. agreed, but went further; specifically holding that PNC had breached its customer Account Agreement. He reviewed the Account Agreement in detail and concluded that the terms of the Account Agreement did not disclose PNC's posting practices or permit PNC to impose overdraft fees by posting all debits at the end of a business day, using a high-to-low posting, so that account balances were not known before placing additional transactions. Henry v. PNC Bank, No. GD-10-022974, No. 24, p. 9 (Pa. C.P. Allegheny County, February 1, 2012). Accordingly, Judge Wettick held that plaintiff's claim for breach of the implied covenant of fair dealing and good faith could be enforced through a breach of contract action. Id. He also overruled PNC's preliminary objections to plaintiff's claim for the violation of state consumer protection law, finding that the claim was dependent upon the success of a breach of contract, and if successful, "provided additional protections to consumers beyond those provided by contract law." Id.

Judge Wettick also dismissed plaintiff's remaining common law claims. First, with regard to plaintiff's claim for unconscionability, he concluded that under Pennsylvania law,

unconscionability is a defense to the enforcement of an allegedly unfair contract or contractual provision. Because PNC's Account Agreement failed to properly inform customers of the posting sequence, the court determined that there was no contractual provision to avoid, rendering the claim inapt. Plaintiff's claim for conversion was also dismissed because the court agreed with PNC that the "gist of the action" doctrine barred recovery in tort. "Plaintiff voluntarily deposited money with PNC with the understanding that the rights and obligations of the parties concerning this money would be governed by the Account Agreement. Thus, because liability stems from the alleged breach of implied contractual duties, the success of the tort claim is dependent on the success of the breach of the contract claim." Id. at 14.

For the same reason, Judge Wettick sustained PNC's preliminary objections to plaintiff's unjust enrichment claim, finding unjust enrichment "inapplicable where the relationship between the parties is founded upon a contract; it applies only where there is no contract." Id. In sum, the court noted:

> Plaintiff is not claiming that she did not know that overdraft fees would be charged if her debits exceeded the amount of funds in her checking account. However, she correctly contends that she never knew of, and never agreed to, PNC's use of any specific method for calculating overdraft fees because *as I have already ruled, (1) the Account Agreement does not adequately explain that PNC would post all debit transactions the end of a business day, using a high-to-low posting sequence and (2) PNC does not claim that the Account Agreement describes any other method of calculating overdraft fees.*

> Every contract imposes upon each party a duty of good faith and fair dealing in its performance. There is no breach of this implied covenant where a party to a contract has done what the provisions of the contract expressly give it the right to do. However, where, as in this case, the manner of performance is not specifically prescribed, a party exercising its discretion is subject to an implied obligation of good faith and fair dealing.

> In the present case, the agreement between PNC and plaintiff does not expressly permit PNC to impose overdraft fees by posting all debits at the end of a business day, using a high-to-low posting. Furthermore, this is not the only method for imposing overdraft fees that would have been available to PNC. Consequently,

plaintiff may base a breach of contract action on allegations that PNC's use of this method of calculating overdraft fees constituted a breach of the implied covenant of fair dealing and good faith.

Id. at 8-9 (italics added, internal citations omitted).

The MDL and Trombley actions have settled with the approval of the United States District Courts for the Southern District of Florida and the District of Colombia, respectively. [ECF No. 49-22, p.2; ECF No. 49-33, p.2]. The Henry litigation has also been resolved through the entry of a Stipulated Order of Court, wherein it was acknowledged that the claims of any putative class members were resolved through the MDL settlement. Henry, No. GD-10-022974 (Pa. C.P. Allegheny County November 1, 2013).

The settlement agreements and related orders for the Trombley and MDL actions are set forth in the Joint Appendix. The Trombley settlement [ECF No. 49-22, p. 47], provided for $12,000,000 (plus claims administration expenses) to pay a "refund" of any overdraft fees incurred by National City customers for debit card transactions over any selected two month period. [ECF No. 49-20, pp. 2, 18]. Similarly, the MDL settlement agreement, approved by the District Court for the Southern District of Florida and entered on August 5, 2013, provided for the creation of a $90,000,000 common fund (plus claims administration expenses), to reimburse a pro rata share of the "Positive Differential Overdraft Fee" charged each PNC account holder. This "Positive Differential Overdraft Fee" was to be calculated based upon the amount of overdraft fees charged to PNC account holders that would not have been assessed if PNC had used an alternative posting sequence or method for posting debit card transactions other than high-to-low posting. Recovery was then calculated based upon the additional overdraft fees those account holders paid through PNC's high-to-low posting order. [ECF No. 49-27, pp. 2-6; ECF No. 49-33, pp. 9-10].

The parties agree for purposes of the pending cross motions for judgment on the pleadings that PNC incurred a combined total of $102 million for settlement costs, an additional $3 million in notice and administrative costs related to the class action settlements, and $2,301.746.18 in legal fees and expert expenses for the resolution of the underlying class action lawsuits.

PNC has disclosed the class action lawsuits and the settlements in the Securities and Exchange Commission Form 10-K, Annual Reports filed during the relevant time period. In the 2013 Annual Report, filed for fiscal year ending December 31, 2012, PNC described the nature of the claims in each of the class action lawsuits as follows:

> The complaints in each of these lawsuits allege that the banks engaged in unlawful practices in assessing overdraft fees arising from electronic point-of-sale and ATM debits. The principal practice challenged in these lawsuits is the banks' purportedly common practice of posting debit transactions on a daily basis from highest amount to lowest amount, thereby allegedly inflating the number of overdraft fees assessed. Other practices challenged include the failure to decline to honor debit card transactions where the account has insufficient funds to cover the transactions.

> In the consolidated amended complaint against PNC Bank in the MDL Court, the plaintiffs asserted claims for breach of the covenant of good faith and fair dealing, unconscionability; conversion; unjust enrichment; and violation of the consumer protection statutes of Pennsylvania, Illinois and New Jersey. … In the <u>Henry</u> case, the remaining claims are for breach of contract and the duty of good faith and fair dealing and for violation of Pennsylvania's consumer protection statute. In their complaints, the plaintiffs seek, among other things, *restitution of overdraft fees paid*, unspecified actual and punitive damages (with actual damages, in some cases, trebled under state law), pre-judgment interest, attorneys' fees, and declaratory relief finding the overdraft policies to be unfair and unconscionable.

The PNC Financial Services Group, Inc., Annual Report (Form 10-K), at 222-223 (March 1, 2013)(italics added).

### 2. The Policies

PNC's liability insurance program for the relevant policy period was built upon a $25 million self-insured retention, followed by a $25 million combined liability policy issued by HCC and, for covered claims exceeding the first $50 million, a $25 million excess insurance policy issued by Axis. Given the settlement agreements entered into in the MDL and Trombley actions, both layers of coverage are implicated in full. HCC and Axis contend, however, that neither policy provides coverage for the settlement of the underlying overdraft fee class action lawsuits.

### a. HCC Policy

In 2009, PNC was insured by HCC pursuant to the terms of a Blended Executive Risk Insurance Policy [ECF No. 49-1, p. 12, ECF No. 49-2, p. 3]. This "claims made" policy includes Directors and Officers Liability (Coverage Section A); Financial Institution Professional Liability (Coverage Section B); Employment Practices Liability (Coverage Section C) and Financial Institution Bond (Coverage Section D). The premium for all coverage afforded under the Policy was $3.85 million. Id.

The pending dispute involves the provisions of Coverage Section B, Financial Institution Professional Liability. The relevant terms of the policy provide in pertinent part:

**1. INSURING AGREEMENTS**

The **Underwriter** will pay on behalf of the **Insured**:

> (A)    All **Loss** for which the **Insured** becomes legally obligated to pay on account of any **Claim** first made against the **Insured** during the **Policy Period** or, if applicable, the **Discovery Period**, for a **Wrongful Act** which takes place during or prior to the **Policy Period**; provided, however, the **Insured** shall report such **Claim** to the **Underwriter** as soon as practicable, but in no event later than 90 days after termination of the **Policy Period** or, if applicable, the **Discovery Period**….

## 4. DEFINITIONS

(A) **Claim**, either in the singular or plural, means:

    (1) a written demand for monetary, non-monetary or injunctive relief;

    (2) a civil, criminal, administrative, regulatory or arbitration proceeding which is commenced by:

        (a) service of a complaint or similar pleading;

for a **Wrongful Act**….

(E) **Damages** means a judgment, award, surcharge or settlement as a result of a **Claim** and any award of pre- and post-judgment interest, attorneys' fees and costs. **Damages** shall not include any:

    (1) taxes, civil or criminal fines or penalties, other than (a) the 20% or less civil penalties imposed upon and **Insured** under Sections 502(i) and 502(l) pf the Employee Retirement Income Security Act of 1974, as amended (hereinafter ERISA), or (b) penalities or fines imposed upon an **Insured** pursuant to the Health Insurance Portability and Accountability Act of 1996, amended;

    (2) amounts for which the **Insured** is liable under the terms of a **Sponsored Plan** [separately defined as an employee benefit plan] as remuneration, overhead or benefits paid or payable pursuant to the terms of such **Sponsored Plan** ….

    (3) amount for which no **Insured** is financially liable or for which there is no legal recourse against any **Insured**;

    (4) salaries or commissions of any **Insured**;

    (5) fees, commissions or charges for **Professional Services** paid or payable to an **Insured**;

    (6) principal, interest, or other monies paid, accrued or due an **Insured** as the result of any loan, leas or extension of credit;

    (7) direct investment of the **Insured** in any debt or equity security underwritten by the **Insured**; or

(8) loss of the actual money, securities, property, **Documents** or other items of value in the custody or control of the **Insureds**, or its agents, or in transit.

**Damages** will include punitive, exemplary or the multiplied portion of any multiplied damages award. The insurability of punitive, exemplary or multiplied damages shall be governed by the law of any applicable jurisdiction which most favors coverage for such punitive, exemplary or multiple damages.

(I) **Interrelated Wrongful Acts**, either in the singular or plural, means all casually connected **Wrongful Acts**.

(J) **Loss** means **Claims Expenses** and **Damages**.

(O) **Professional Services** means:

(1) services performed by the **Insured** (or by any other person or entity for whose acts, errors or omissions the **Insured** is or is alleged to legally responsible) for, for the benefit of, or on behalf of a **Customer** or potential **Customer** of the **Insured** for a fee, commission, or other consideration (or where a fee, commission or other consideration would normally be received by the **Insured**)….

(V) **Wrongful Act** means any:

(1) actual or alleged act, error or omission committed by any **Insured** in the rendering of or failure to render **Professional Services**….

## 5. EXCLUSIONS

The Underwriter shall not be liable to make any payment for **Loss** on account of a **Claim**:

(C) brought about or contributed to in fact by any:

(1) deliberately dishonest, fraudulent or criminal act or omission committed by an **Insured**; or

(2) profit or remuneration gained by any **Insured** to which such **Insured** is not legally entitled;

as determined by a final adjudication in the underlying action….

6.        **LIMITS OF LIABILITY AND RETENTION**

(A)       The Underwriter's aggregate Limit of Liability for all **Loss** under this Coverage Section shall be the amount shown in ITEM C of the Declarations, whether such **Loss** is covered under one or more Insuring Agreements.…

(B)       The Underwriter's liability for **Loss** arising from each **Claim** shall apply only to that part of **Loss** which is in excess of the retention amount set forth in ITEM D of the Declarations.…

(C)       All **Claims** arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** of one or more of the **Insureds** shall be considered a single **Claim**.…

[ECF No. 49-2, pp. 16-23].

**b.        Axis Policy**

The Axis policy provides $25,000,000 of excess professional liability coverage. The terms of the Axis policy provide that it follows the terms of the underlying HCC policy and absent a contractual provision to the contrary, incorporates the terms, conditions, exclusions and endorsements of the HCC policy. [ECF No. 49-4].

**D.        DISCUSSION**

**1.        Policy Construction and Duty to Defend and Indemnify**

The parties agree that Pennsylvania law governs the interpretation of the applicable parties. Under Pennsylvania law, interpretation of an insurance contract is a question of law that is properly decided by the court. <u>Gardner v. State Farm Fire and Casualty Co.</u>, 544 F.3d 553, 558 (3d Cir. 2008) (citing <u>Donegal Mutual Insurance Co. v. Baumhammers</u>, 595 Pa. 147, 938 A.2d 286, 290 (2007) (quotations omitted)); <u>see</u> <u>also</u> <u>Liberty Mutual Insurance Co. v. Treesdale, Inc.</u>, 418 F.3d 330, 334 (3d Cir. 2005); <u>Reliance Insurance Co. v. Moessner</u>, 121 F.3d 895, 900 (3d Cir.1997). The obligation of the Court to give effect to the insurance policy as written is well settled.

When interpreting an insurance contract, the court must determine the intent of the parties "as manifested by the language of the written agreement." Travelers Casualty & Surety Co. v. Castegnaro, 565 Pa. 246, 772 A.2d 456, 459 (2001); see also Norfab Corp. v. Travelers Indemnity Co., 555 F. Supp.2d 505, 509 (E.D. Pa. 2008) (citing 401 Fourth St., Inc. v. Investors Insurance Group, 583 Pa. 445, 879 A.2d 166, 171 (2005)). Where the language of the policy is clear and unambiguous, the court must give effect to the plain language of the agreement. Id. at 459, 772 A.2d 456 (citing Bateman v. Motorists Mutual Insurance Co., 527 Pa. 241, 590 A.2d 281, 283 (1991); Standard Venetian Blind Co. v. American Empire Insurance Co., 503 Pa. 300, 469 A.2d 563 (1983); Gardner, 2008 WL 2805641 at * 11 (citing Donegal Mutual Insurance Co., 938 A.2d at 290) (quotations omitted)). An ambiguity exists when there is more than one possible interpretation or if the contract is susceptible to more than one possible construction. Medical Protective Co. v. Watkins, 198 F.3d 100, 104 (3d Cir.1999); McMillan v. State Mutual Life Assur. Co. of America, 922 F.2d 1073, 1077 (3d Cir.1990). "The Court cannot ... distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity. The polestar of our inquiry, therefore, is the language of the insurance policy. Additionally, an ambiguity does not exist simply because the parties disagree on the proper construction ... Courts should read policy provisions to avoid an ambiguity if possible." O'Connor–Kohler v. United Services Auto. Ass'n., 883 A.2d 673, 679 (Pa. Super. 2005) (citing Neuhard v. Travelers, 831 A.2d 602, 604–05 (Pa. Super. 2003) (citations omitted)). When an ambiguity exists in a provision of an insurance policy, the provision must be construed in favor of the insured and against the insurer. Medical Protective Co., 198 F.3d at 103; St. Paul Fire & Marine Insurance Co. v. Lewis, 935 F.2d 1428, 1431 (3d Cir.1991). Furthermore, in construing the terms of an insurance policy, the court must read the policy in its entirety, "in a manner that gives effect to all of the policy language if at all possible." Millers Capital Insurance Co. v. Gambone Bros. Development Co., 941 A.2d 706, 715 (Pa. Super. 1998) (citations omitted). "The Court should not consider individual terms removed from their context, but should instead consider the entire contractual provision to determine the intent of the parties." Norfab, 555 F. Supp.2d at 509 (citing 401 Fourth St., 879 A.2d at 171).

In construing the language of an insurance policy, the Court must give effect to the reasonable expectations of the insured. Millers, 941 A.2d at 717 (citing Bubis v. Prudential Property & Casualty Ins. Co., 718 A.2d 1270, 1272 (Pa. Super.1998)). The "reasonable expectations" doctrine is "intended to protect against the inherent danger, created by the nature of the insurance industry, that an insurer will agree to certain coverage when receiving the insured's application, and then unilaterally change those terms when it later issues a policy." Moss Signs, Inc. v. State Auto. Mutual Insurance Co., Civil Action No. 08–164, 2008 WL 892032 at *2 (quoting UPMC Health System v. Metro. Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004)). [T]he United States Court of Appeals for the Third Circuit has predicted that the Supreme Court of Pennsylvania would find that the reasonable expectations doctrine applies to sophisticated commercial purchasers

of insurance. <u>UPMC Health System</u>, 391 F.3d at 502. However, the Court of Appeals further held that "status as a sophisticated purchaser is a factor to be considered when resolving whether the insured acted reasonably in expecting a given claim to be covered." <u>Id.</u> (citing <u>Reliance</u>, 121 F.3d 895, 906 (3d Cir.1977)). Moreover, an "insured may not complain that its reasonable expectations have been frustrated when the applicable policy limitations are clear and unambiguous." <u>Millers</u>, 941 A.2d at 717 (citing <u>Bubis v. Prudential Property & Casualty Insurance Co.</u>, 718 A.2d at 1270, 1272 (Pa. Super. 1998); <u>Bateman v. Motorists Mutual Insurance Co.</u>, 527 Pa. 241, 590 A.2d 281, 283 (1991); <u>Neil v. Allstate Ins. Co.</u>, 549 A.2d 1304 (Pa.1988); <u>St. Paul Mercury Insurance Co. v. Corbett</u>, 428 Pa. Super. 54, 630 A.2d 28 (1993) (<em>en banc</em>)). Further the Court must not, in the context of a commercial insurance policy, look beyond the plain language of the agreement in order to give effect to the insured's expectations where the language of the contract is clear and unambiguous. <u>Canal Insurance Co. v. Underwriters at Lloyd's London</u>, 435 F.3d 431, 440 (3d Cir. 2006) (citing <u>Matcon Diamond v. Pennsylvania Nat'l Ins. Co.</u>, 815 A.2d 1109, 1114 (Pa. Super. 2003); <u>Liberty Mutual Insurance Co. v. Treesdale</u>, 418 F.3d 330, 344 (3d Cir. 2005)).

<u>Whole Enchilada, Inc. v. Travelers Prop. Cas. Co. of Am.</u>, 581 F. Supp. 2d 677, 689-690 (W.D. Pa. 2008).

"The burden is on the insured to establish coverage under an insurance policy.... It is the insurer, however, that bears the burden of establishing the applicability of an exclusion in an insurance contract, and exclusions are always strictly construed against the insurer and in favor of the insured. <u>Nationwide Mut. Ins. Co. v. Cosenza</u>, 258 F.3d 197, 206–07 (3d Cir. 2001) (citations omitted). "Where an insurer relies on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense and, accordingly, bears the burden of proving such defense." <u>Madison Constr. Co. v. Harleysville Mut. Ins. Co.</u>, 557 Pa. 595, 735 A.2d 100, 106 (1999).

In this case, PNC seeks to recover indemnity for the settlement agreements as well as expenses related to the defense of the underlying actions, up to the coverage limits afforded by the HCC and Axis policies. With regard to the duty to defend, the Pennsylvania Supreme Court

has held that an insurer's duty to defend is broader than its duty to indemnify. It is "a distinct obligation, separate and apart from the insurer's duty to provide coverage." Erie Ins. Exch. v. Transamerica Ins. Co., 516 Pa. 574, 533 A.2d 1363 (1987). An insurer is obligated to defend its insured if the factual allegations of the complaint on its face encompass an injury that is actually or potentially within the scope of the policy. Id. at 1368 (describing the duty to defend as arising "whenever the complaint filed by the injured party may potentially come within the coverage of the policy." (emphasis in original)); Gedeon v. State Farm Mut. Auto. Ins. Co., 410 Pa. 55, 188 A.2d 320 (1963) (same).

Accordingly, it is the potential, rather than the certainty, of a claim falling within the insurance policy that triggers the insurer's duty to defend. The question of whether a claim against an insured is potentially covered is answered by comparing the four corners of the insurance contract to the four corners of the complaint. See Donegal Mut. Ins. Co. v. Baumhammers, 595 Pa. 147, 938 A.2d 286, 290 (2007) ("The language of the policy and the allegations of the complaint must be construed together to determine the insurers' obligation.").

> An insurer may not justifiably refuse to defend a claim against its insured unless it is clear from an examination of the allegations in the complaint and the language of the policy that the claim does not potentially come within the coverage of the policy. See [General Accident Ins. Co. v.] Allen, 547 Pa. 693, 692 A.2d [1089,] 1094 [ (1997) ] ("[T]he obligation to defend an action brought against the insured is to be determined solely by the allegations of *567 the complaint in the action...."); Gene's Restaurant, Inc. v. Nationwide Ins. Co., 519 Pa. 306, 548 A.2d 246, 246–47 (1988) ("[I]n determining the duty to defend, the complaint claiming damages must be compared to the policy ... the language of the policy and the allegations of the complaint must be construed together to determine the insurer's obligation."); Springfield Tp. et al. v. Indemnity Ins. Co. of North America, 361 Pa. 461, 64 A.2d 761 (1949) ("It is not the actual details of the injury, but the nature of the claim which determines whether the insurer is required to defend."). In making this determination, the "factual allegations of the underlying complaint against the insured are to be taken as true and liberally construed in favor of the insured." Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co., 193 F.3d 742 (3d Cir. 1999) (citing Biborosch v. Transamerica Ins. Co., 412 Pa.Super. 505, 603 A.2d 1050, 1052 (1992)). Indeed, the duty to defend is not limited to meritorious

actions; it even extends to actions that are "groundless, false, or fraudulent" as long as there exists the possibility that the allegations implicate coverage. Transamerica, 533 A.2d at 1368; Gedeon, 188 A.2d at 321.

ACE Capital Ltd. v. Morgan Waldon Ins. Mgmt., LLC, 832 F. Supp. 2d 554, 566-67 (W.D. Pa. 2011)(citing American and Foreign Ins. Co. v. Jerry's Sports Center, Inc., 606 Pa. 584, 2 A.3d 526, 540–41 (2010) (some citations omitted)).

PNC advances a straight forward argument that the Insurers owe both a duty to defend and a duty to indemnify under the applicable policies: PNC and National City are "insureds" under the policies; "claims" (civil proceedings commenced by service of a complaint) were made against PNC and National City for a "wrongful act" committed in the delivery of "professional services" (undisclosed and unfair overdraft posting practices/services provided by PNC on behalf of a customer for a fee), which resulted in a "loss" (settlement of underlying class action lawsuits). In ascertaining the intent of the parties as manifested by the language of the policies at issue, PNC contends the Insurers have wrongfully denied coverage for the underlying class actions lawsuits. It is apparent to the Court that PNC has met the requisite initial burden of establishing coverage for the claims against it.

The Insurers counter that there is no coverage for the underlying claims as a matter of law. First, the Insurers contend that the settlements represent a return of "fees" or amounts due for "loans" and therefore fall within unambiguous exceptions to the definition of "damages." Second, the Insurers argue that Pennsylvania public policy precludes insurance coverage for restitution arising out of PNC's deliberate breach of contract with its account holders. Accordingly, the Insurers contend that judgment on the pleadings must be entered in favor of each insurer and against PNC.

### a.    Policy Provisions

The Insurers first argue that the grant of coverage under the HCC and Axis policies carve out from covered "damages" "fees, commissions or charges for Professional Services paid or payable to an Insured."  According to the Insurers, since the underlying settlements represent "fees" which were paid to PNC or National City for "Professional Services," there is no coverage for the loss.  Alternatively, the Insurers contend that the fees charged for overdraft services were amounts "paid … as a result of any … loan … or extension of credit," and are similarly carved out of the definition of "damages."  [ECF No. 51, p. 16]

These arguments are unavailing. In making this determination, the Court reads the exceptions to the "damages" provision in favor of the insured, and notes that the Insurers bear the burden of proof on this issue. Nationwide Mut. Ins. Co. v. Cosenza, 258 F.3d at 197; Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d at 106.  With regard to both exceptions to "damages," it is clear that the identified policy provisions, taken in context with the surrounding exceptions to covered damages, are intended to exclude from coverage *first party* losses sustained by PNC which constitute fees or loan interest "paid or payable" to PNC. Pursuant to the "damages" provision, the policy provides coverage for judgments, awards, or settlements payable to *third parties* resulting from a claim, but precludes recovery as losses (i) "salaries or commissions of any Insured; (ii) "fees, commissions or charges for Professional Services paid or payable to an Insured;" (iii) "principal, interest or other monies paid, accrued or due an Insured as the result of any loan, lease or extension of credit;" as well as (iv) any "direct investment of the Insured in any debt or equity security underwritten by the Insured."  [ECF No. 49-2, p. 18].  Thus, the definition of "damages" carves out recovery *by the Insured* any direct

payment of fees, commissions or charges for Professional Services, as well as loan proceeds or income.

In this regard, the Court agrees with PNC that permitting the exceptions to the definition of "damages" to apply to third-party claims for improperly assessed fees or loan interest charges would render coverage under the financial institution liability policy illusory. Were the Insurer's interpretation to apply, it is difficult to imagine any circumstance where third-party liability coverage would be afforded to a financial institution under the Wrongful Acts coverage provided, given the nature of a bank's business and its income, predicated upon fees charged, commissions earned, and interest or other monies paid for loans. Instead, the fees and loan related exceptions serve to prevent the conversion of a third-party liability policy into a first-party lost-profit indemnity contract. Consequently, the breadth of the language of the damages provision, providing coverage for judgment, awards, surcharges, or settlements as a result of a "claim" is sufficiently expansive to include the underlying settlements at issue.

Additional support for coverage for the settlements as "damages" is found by reference and comparison to the express exclusion for third-party claims or losses brought about by "profit of remuneration gained by any **Insured** to which such insured in not legally entitled; as determined by a final adjudication in the underlying action." [ECF No. 49-2, p. 15]. This provision unambiguously excludes coverage for underlying litigation predicated upon PNC's wrongful receipt of overdraft fees, had such actions proceeded to final adjudication, and judgment been entered against PNC. The exclusion for unlawful profits would be superfluous if the Insurers' interpretation of the exceptions to "damages" applied to third-party liability claims, because a final adjudication would not be necessary to exclude all claims arising out fees or loans payable to PNC.

The Court notes that, in contrast to other coverage disputes arising out of alleged breach of contract or intentional unlawful conduct, the "wrongful acts" coverage at issue in the instant case is quite broad. The policies do not contain common exclusions for damages arising out of breach of contract, nor do they otherwise preclude coverage for restitution arising out of wrongful business practices. See, e.g., Executive Risk Indemnity v. CIGNA Corporation, 976 A.2d 1170, 1172 (Pa. Super 2009)(exclusion where loss claimed is for an amount due under contract); Lebanon School Dist. v. Netherlands Ins. Co., No. 12-cv-988, 2013 WL 308702 at *7 (M.D. Pa. 2013) (exclusion for wrongful acts that gain "a profit or advantage of which the insured or other person … was not legally entitled"). Such provisions and terms are a matter of contract, for which the parties could have negotiated or bargained. In the absence of any such limitations, or a countervailing public policy prohibition, the policies at issue cover the underlying settlements reached in the MDL, Trombley and Henry class actions, up to the policy limits.

### b. Public Policy

The Insurers contend that even if not expressly excluded from coverage, the policies do not provide coverage for the underlying overdraft litigation settlements, because the losses are uninsurable under Pennsylvania law. Specifically, the Insurers contend that the relief sought and paid through the MDL and Trombley settlements constitutes a return of overdraft fees in the form of restitution. The Insurers point to the language of the Trombley settlement agreement, providing for a "refund" of an amount equal to improper overdraft fees incurred in any two month period of an account holder's choosing. [ECF No. 51, p. 10]. Similarly, the MDL settlement provided for a calculation of the "Differential Overdraft Fee," representing an amount

an account holder would have been charged if the posting order were reversed. [ECF No. 49-23, pp. 36-39; ECF No. 49-24, p. 6].

Because the nature of the damages returned through settlement lies in restitution for amounts improperly collected, the Insurers contend that permitting coverage for the settlements would result in a "windfall" to PNC. [ECF No. 55, p. 4]. A windfall would occur because PNC could keep profits unlawfully obtained by shifting liability for the required refunds to its Insurers. The Insurers contend that such a result is contrary to Pennsylvania public policy, as expressed in Central Dauphin School District v. American Casualty Company, 426 A.2d 94 (Pa. 1981), where the Pennsylvania Supreme Court held that it would offend public policy to permit insurance coverage for refunds paid by a school district to taxpayers arising out of an unlawful tax measure. As the Pennsylvania Supreme Court explained in BLaST Intermediate Unit 17 v. CNA Ins. Companies, 674 A.2d 687, 690 (Pa. 1996),

> the Central Dauphin School District ("the school district") issued a resolution which imposed a tax on people over eighteen years of age who lived in the district. After the tax was collected, certain taxpayers brought suit challenging the validity of the school district's resolution. The court of common pleas struck down portions of the resolution and directed the school district to refund the taxes collected. The school district did not appeal this decision and began to refund the unlawfully collected taxes.
>
> > The school district sought from its insurance carrier the amount of revenue it had illegally collected and was ordered to refund to taxpayers. In finding that the school district had not sustained a loss within the meaning of its insurance policy, this Court stated that the public policy of this Commonwealth would be offended by permitting a political subdivision to use public funds to purchase "insurance" against court-ordered and statutorily-mandated refunding of taxes collected through an unlawful taxing measure.... A district would be able to subject its citizens to an unlawful tax measure like the one imposed here, and yet in effect retain the proceeds of the unlawful tax simply by recovering on the claimed insurance coverage.

Central Dauphin Sch. Dist. v. American Casualty Co., 493 Pa. at 259, 426 A.2d at 96. We further held that even though the school district had acted negligently rather than in bad faith, it could not avoid the consequences of its unlawful tax measure through its insurance. Id. at 260, 426 A.2d at 97. This was so because taxation must strictly comply with constitutional and statutory provisions. Id. Thus, we found that the school district had not suffered a loss within the meaning of its insurance policy because the public policy of this Commonwealth does not allow unlawful taxing measures to produce revenue in the same way lawful taxation does. Id. To hold otherwise would allow a taxing body to impose unlawful taxes upon its citizens yet retain the proceeds of that tax by recovering on its insurance policy. Id. at 259, 426 A.2d at 96.

The Insurers contend that permitting PNC coverage for unlawful overdraft practices would similarly permit it to retain profits illegally earned, and if coverage is deemed owed, run counter to the policy concerns addressed in Central Dauphin.

PNC responds that Central Dauphin has been limited to the facts presented, i.e., an underlying judicial finding of illegal taxation by a municipality. PNC relies upon the absence of a judicial finding that PNC gained profits to which it was not legally entitled,[2] as well as the absence of a recognized public policy against "insuring the claims pending against PNC." PNC cites to nonbinding judicial opinions extending coverage to settlements and/or claims involving conversion, unjust enrichment, violations of consumer protections statutes, and breach of contract, as demonstrating the absence of clear public policy precluding coverage for the underlying settlement agreements at issue here.[3]

This Court is constrained to agree with PNC's final argument in favor of coverage. First, the Pennsylvania Supreme Court has limited its holding in Central Dauphin. In Hall v. Amica

---

[2] PNC's argument ignores Judge Wettick's opinion resolving preliminary objections against it in the Henry class action complaint, finding that PNC breached it customer Account Agreements by posting transactions in a manner not authorized nor adequately disclosed.

[3] See, ECF No. 48, p. 23 n. 14, citing Photomedex, Inc. v. St. Paul Fire & Marine Ins. Co., 2008 WL 324025 (E.D. Pa. Feb. 6, 2008) (conversion); Reliance Ins. Co. v. Armstrong World Indus., Inc., 614 A.2d 642, 658 (N.J. Super. 1992)(unjust enrichment); American Alliance Ins. Co. v. Jencraft Corp., 21 F. Supp.2d 485 (D.N.J. 1998)(violations of consumer protection statutes); Verticalnet, Inc. v. U.S. Specialty Ins. Co., 492 F. Supp. 2d 452, 460 (E.D. Pa. 2007)(breach of contract).

Mutual Insurance Co., 648 A.2d 755, 760-61 (Pa. 1994), the Court stated that public policy may

be the basis for altering the terms of an insurance contract only in the "clearest of cases."

In BLaST Intermediate Unit 17 v. CNA Ins. Companies, supra, a school district sought

coverage for an underlying violation of the Equal Pay Act. The Pennsylvania Supreme Court

flatly rejected the insurer's argument that coverage for the violation of a statue would offend

public policy.

> In Central Dauphin we were faced with the potential for school districts, or any
> political subdivision, to unlawfully collect taxes and receive the amount of such
> taxes from an insurance carrier after the taxes had been refunded. Because the tax
> was unlawful, the school district was never entitled to revenue from the taxes.
> Clearly, there was no loss to the school board; rather, the school board would
> have realized a windfall if allowed to collect from its insurance carrier after
> refunding the taxes. It was obviously against public policy to allow the school
> district to use unlawful activity as a money-making endeavor.
>
> In the instant matter, BLaST did suffer a loss, and there is no legitimate public
> policy reason which should disallow this loss under BLaST's insurance coverage.
> Although BLaST did violate a statute [Equal Pay Act], it will not receive a
> windfall upon indemnification by CNA for this violation. Unlike the school
> district in Central Dauphin, indemnification will not place BLaST in a better
> position than it was in prior to the judgment against it. BLaST is not being
> permitted to earn revenue through violation of a statute. In contrast, the school
> district in Central Dauphin would have been permitted to do so had we allowed it
> to receive indemnification from its insurance carrier for the unlawfully collected
> taxes. Moreover, allowing Appellant to collect under its insurance policy will not
> encourage others to intentionally engage in unlawful activity with the purpose of
> reaping a benefit from such activity through its insurance. Our holding today
> extends only to those statutory violations which are negligent.

BLaST Intermediate Unit 17 v. CNA Ins. Companies, 674 A.2d at 690 – 691. Thus, public policy

has been held to preclude coverage where a municipal taxing authority has sought an unlawful

"windfall" or where the violation of a criminal law is the basis of the coverage dispute, or for

willful and intentional conduct that would otherwise support a claim for punitive damages. See,

Minnesota Fire and Cas. Co. v. Greenfield, 855 A.2d 854, 867 n.14 (Pa. 2004).

Here, the Insurers classify coverage for the settlements as a prohibited windfall, given PNC's ability to effectively retain the proceeds from the breach of its Account Agreements by passing the costs of the agreed to refunds onto its insurers. However, PNC's conduct has not been judicially determined to have been in bad faith or to violate consumer protection or criminal laws. As in <u>BLaST</u>, where the Court acknowledged that no public policy prohibition is implicated by permitting insurance coverage for statutory violations founded in negligence, in the absence of any specific finding of criminal activity, willful misconduct or bad faith, Pennsylvania public policy does not preclude a finding of coverage under the broad insurance policies issued by Defendants here. Any purported windfall arises solely from the expansive coverage provided by the Insurers, who failed to exclude coverage for breach of contract or restitution claims arising out of a "wrongful act."

### D.  CONCLUSION

Having concluded that neither the policies at issue nor Pennsylvania public policy prohibit coverage for the contract based claims at issue, PNC is entitled to the benefit of the coverage it has purchased. Given that "damages" includes settlement of claims arising out of "wrongful acts" committed by PNC in the course of its business transactions, including the retention of profits not finally adjudicated unlawful, the Court finds as a matter of law that the MDL, <u>Henry</u> and <u>Trombley</u> settlements are covered losses under the policies at issue. Accordingly, it is respectfully recommended that PNC's Motion for Judgment on the Pleadings [ECF No. 47] be granted, and the Motion for Judgment on the Pleadings filed on behalf of Houston Casualty Company and Axis Insurance Company [ECF No. 50] be denied.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule

established in the docket entry reflecting the filing of this Report and Recommendation.  Failure

to timely file objections will waive the right to appeal.  <u>Brightwell v. Lehman</u>, 637 F.3d 187, 193

n. 7 (3d Cir. 2011).  Any party opposing objections may file their response to the objections

within fourteen (14) days thereafter in accordance with Local Civil Rule 72.D.2.


Respectfully submitted,


/s/ Maureen P. Kelly
MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE


Dated: May 21, 2014


cc:     The Honorable Cathy Bissoon
        United States District Judge

        All counsel of record by Notice of Electronic Filing